*In re* SANDRA SCIARA, Respondent—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* SANDRA SCIARA, Respondent-Appellant.)

(No. 59585;

First District (5th Division)—August 9, 1974.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Barry Rand Elden, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This appeal arises from an order finding respondent in need of mental treatment and placing her in the care and custody of her husband for 1 year, with authority to commit her to the Chicago Lake Shore Hospital.

On appeal, respondent contends (1) the standard of proof for civil commitment should have been proof beyond a reasonable doubt, or clear and convincing proof, and that under either of these standards, the evidence was insufficient to establish that she was a person in need of mental treatment; and (2) she was denied her right to a jury trial.

This matter began with the filing of a petition by respondent's husband for her hospitalization, which was supported by certificates of need for hospitalization by two doctors. At the hearing on the petition, the public defender, appointed to represent respondent, informed the court, "We are ready for hearing, Your Honor. Jury is waived." Thereupon, a psychiatrist, Dr. Dushkin, testified he had examined respondent several times in the past and found "she presents all of the symptoms of a severe schizophrenic, paranoid type." He also testified she was "psychotic, delusional, hallucinatory, autistic, and unpredictable in her ability to care for herself or her children." She had delusions that "if she were to be touched by individuals she would dissolve into nothing or die and that all meat is representative of death, not to be eaten, not only by herself or by her children." He stated her hallucinations were manifested by the fact that before answering questions "she would look to the side and always to the same area and then either answer or refuse to answer as if she was being warned. When he inquired whether she was being warned not to answer, she "smiled a little bit in a knowingly fashion." The doctor stated she demonstrated her autism (thinking based on wishes rather than on reality) by "her feeling that nothing actually that was happening really meant anything, that she should be able to be permitted to leave the hospital and go into a full life, that if her husband were to come back everything would be nice and happy."

According to the witness, her unpredictability with reference to the care of herself and her children was indicated by her inability to handle her affairs at home or to take care of herself in the hospital. He admitted

that his opinion concerning her inability to care for her children was based on a report by her pediatrician,[1] but that his opinion that she could not care for herself was based on his own observation of her. He also admitted that she was not a violent person and was not a threat to others, other than to her child and then only because of her inability to care for said child. He admitted also that his opinion that she could not take care of her affairs at home was based on the fact that others described her as "not too good of a housekeeper", and on her pediatrician's report that "her infant was not doing or thriving as well as he should."

Dr. J. Herbert Maltz did not testify but stated in a certificate of need for hospitalization, that "she is withdrawn, has difficulty in responding to questions, has some bizarre ideation (about eating meat or having rat poison on her floor) at times she smiles (apparently in response to some internal stimuli) unable to adequately care for herself."

The husband of respondent testified they had been separated for 6 months and he petitioned for her hospitalization because "she seemed to me at that time to be in a deep need of help." He based this belief on the fact that their 18-month-old boy had his chin split open and a burn on his leg, had recently lost a little over a pound in weight and was being fed bread, rice and beans instead of a "normal balanced diet" and was being neglected by respondent "but not like she wanted to hurt him or anything like that" but that "nine times out of ten he'd be naked on the floor." He stated that the older child, 6 years of age, was allowed to play outside as late as 10 P.M. and that respondent was not giving milk to her children. He also stated that respondent told him she heard voices which told her there was rat poison on the floor and that she said on one occasion, "We are turning into cannibals and we are going to start eating one another" and on another occasion told him that meat would kill him. He testified that he worried about her when she was on the street because "she gets so wrapped up into these things that she doesn't know what she is doing and doesn't know what street she is on." He stated that before her marriage she tried to slit her wrists and that she had been in hospitals on other occasions for mental problems, the last time being 9 months earlier for a few weeks. He stated her condition had "worsened" in the last 6 months and that he was presently living with the children and that he was giving respondent $15 a week for clothing and groceries and that he also "paid all the bills of every nature." He admitted respondent never threatened to harm him.

Respondent testified she had not been helped during her previous

---

[1] The pediatrician did not testify, and his report was not offered.

hospitalization and during her current 3-week stay at Lake Shore Hospital she was being tormented. She does not eat meat and "they [the staff] insist that I have meat." The staff seemed "a little bit demented." Prior to her going to the hospital, the other child lived with her husband because she could not control him. The younger child, who lived with her until her hospital commitment, was on a diet of scalloped potatoes with cheese, brussel sprouts, broccoli and beans. When the younger child lost some weight, the pediatrician was unable to find anything wrong with him. She did not agree with Dr. Dushkin that she should go to the hospital because "I feel that they are infringing too much on my rights, my mind. I have a right to—I am not a dangerous person. I wanted to start painting or—I sketch and—I feel that—like they might destroy my mind with insulin shock treatments." She further stated she could take care of herself and needed work, suggesting she could be a housekeeper, babysitter or a waitress at night. When asked if she heard "any other voices of persons or things that are not present in the room at the time," she responded, "I did on one occasion close to a year ago." She stated her only other hallucinatory experience since then was to see a ghost once in a while. She testified that the cut on the younger boy's chin occurred when he tripped over raised linoleum in her apartment and that when the apartment was warm, she kept the younger child in a diaper and underwear.

During oral arguments, we were informed that respondent, after the adjudicatory hearing on November 29, 1972, was committed to the Lake Shore Hospital but released within 2 months, and that on June 7, 1974, in a separate proceeding brought on a petition for hospitalization by one Yvonne Stephens, respondent was found not in need of mental treatment. It is also noted that the order of November 29, 1972, expired by its own terms on November 29, 1973.

OPINION

The State first contends that this appeal should be dismissed because the case is now moot, and in support thereof points out (1) respondent was released from the hospital; (2) the adjudication order has expired by its own terms; and (3) respondent was found not in need of mental treatment on June 7, 1974.

■ It is true that when a case is moot, the appeal should be dismissed. (*Wheeler v. Aetna Casualty & Surety Co.*, 57 Ill.2d 184, 311 N.E.2d 134.) However, it appears that two exceptions have developed to this rule; first, where a mootness ruling would eliminate an entire class of cases from appellate review (*People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 104 N.E.2d 769) and second, where there are collateral legal consequences

which survive the expiration of the order under review (*Sibron v. New York*, 392 U.S. 40, 20 L.Ed.2d 917, 88 S.Ct. 1889, *In re Ballay* (D.C. Cir. 1973), 482 F.2d 648).

We understand the argument of respondent to be that she comes within the collateral consequences exception. She refers us to the fact that she was involuntarily committed on two separate occasions and, while this appeal has been pending, another petition for her commitment was filed. It is argued by her counsel that, in the light of her delusions and the medical testimony indicating a likelihood of their persistence, the prospect of other commitment proceedings is not remote.

In opposing the application of the collateral consequences exception, the State invites our attention to the fact that the June 7, 1974, order found respondent not in need of mental treatment, and concludes "it appears almost certain that the record will have no adverse affect on future proceedings since, as stated earlier, the presumption of continuing sanity and competence operates to fully protect Mrs. Sciara."

The State also argues that a finding of need of mental treatment or an admission to a hospital does not entail collateral legal consequences because section 9—11 of the Mental Health Code (Ill. Rev. Stat. 1973, ch. 91½, par. 9—11) explicitly provides that such a finding or admission to a hospital is not an adjudication of legal incompetency, does not deprive the person of his right to exercise all his civil rights, and does not create any presumption that such person is incompetent. The State further argues that since (1) diminution of employment opportunities does not fall within the collateral legal consequences category of *Sibron*, except to the extent that the individual seeks public employment (*Hewett v. State of North Carolina* (4th Cir. 1969), 415 F.2d 1316); and (2) there is no statutory provision requiring custody to be denied to a parent who has been adjudicated in need of mental treatment, respondent is not affected by consequences non-legal in nature and, therefore, there is no reason to continue the litigation of the November 29, 1972, order.

■■ We are of the belief, however, that the question of the application of the collateral consequences exception must be considered on a case-to-case basis. In considering whether it is appropriate here, we have noted that it was the testimony of Dr. Dushkin that he recommended deep-coma insulin therapy, and that if she didn't receive it, "she'll be a resident of institutions like this and possibly be discharged after 20 to 30 years in a backward situation", and he stated further that even if she received this treatment, his prognosis was "still guarded, nothing guaranteed." We note also that respondent's husband testified, "This is a common thing with my wife, where she will show some progress and then backslide to where she was or even worse." In addition, the record discloses that the petition

filed in June, 1974, states "the patient has inappropriate affect, is delusional, and unable to care for herself." Thus, in view of this recent petition and the prior commitments, it is conceivable that the condition of respondent is such that other petitions for her hospitalization may be filed and the reasoning of the court in *Ballay* then becomes significant. There, it was stated at page 651:

> "There is yet another independent reason why the present appeal is not moot—the collateral consequences of being adjudged mentally ill remain to plague appellant. We recently had occasion to consider whether the standard applied in criminal cases, that a 'case is moot only if it is shown that there is *no possibility* that any collateral legal consequence will be imposed on the basis of the challenged conviction,' *Sibron v. New York*, 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed2d 917 (1968) (emphasis added), is applicable to contested civil commitment adjudications. We answered in the affirmative relying upon the multitude of legal disabilities radiating from the label 'mentally incompetent.' [Citations]"

The *Ballay* court then listed some of the restrictions and limitations that may affect an individual adjudicated to be mentally incompetent and stated at page 652:

> "Indeed, such an adjudication, while not always crippling is certainly always an ominous presence in any interaction between the individual and the legal system."

We are aware that *Ballay* involved an adjudication of mental incompetency; whereas, here respondent was committed as a person in need of mental treatment. We are also aware that in Illinois one is presumed competent until the contrary is shown. *People ex rel. Drury v. Catholic Home Bureau*, 34 Ill.2d 84, 213 N.E.2d 507.

■■ Nevertheless, in our consideration of the totality of the circumstances here, we believe that the adjudication might continue to plague respondent in some future proceeding and could also affect her adversely in other respects, including her efforts to obtain employment and, contrary to the contention of the State, in child custody proceedings which might be filed in the future. Therefore, we are of the opinion that the collateral consequences exception should be applied, and we will consider the merits of this appeal.

In this regard, respondent first contends that depriving one of her liberty by a mere preponderance of the evidence, the civil standard of proof, is repugnant to the fundamental principle of equal protection when a higher standard, proof beyond a reasonable doubt, is required in a criminal proceeding. While maintaining that commitment should at

least be based on clear and convincing evidence, she also argues that under either the clear and convincing standard or a preponderance of evidence requirement, the proof presented in the instant case is insufficient to establish that she was a person in need of mental treatment.

■■■ We note that respondent assumes, although there is no such indication in the record, that the trial court applied the preponderance of the evidence standard. In any event, we point out that this court in *People v. Sansone*, 18 Ill.App.3d 315, 309 N.E.2d 733, applied the requirement of clear and convincing proof in a commitment proceeding. There, at page 326, the court stated:

> "Where the issue involved is not the occurrence of an event, but the determination of an individual's mental condition, the State must prove that the individual is in need of mental treatment by clear and convincing evidence. The facts upon which a medical opinion is based must be established by clear and convincing evidence, and the medical testimony upon which the decision to commit is based must be clear and convincing."

We have examined the record here in the light of that standard, and initially we note that section 1—11 of the Mental Health Code [2] (Ill. Rev. Stat. 1971, ch. 91½, par. 1—11) requires that the petitioner first establish that respondent was a person afflicted with mental illness.[3] We interpret the phrase in this section "not including a person who is mentally retarded" to mean that such a person, as defined in section 1—12, is not to be considered a person in need of mental treatment within the meaning of section 1—11. It is our belief however that the Mental Health Code intends that a mentally retarded person, who also has a separate mental illness, could with the proof required by section 1—11 be found to be a person in need of mental treatment.

■■ After establishing respondent was a person afflicted with mental illness, petitioner then was required to prove that, as a result of such mental illness (a) she was reasonably expected, at the time the determination was being made or within a reasonable time thereafter, to intention-

---

[2] " 'Person In Need of Mental Treatment', when used in this Act, means any person afflicted with mental illness, not including a person who is mentally retarded, as defined in this Act, if that person, as a result of such mental illness, is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs."

[3] Section 1—11 of the Mental Health Code was amended effective January 1, 1973, after the trial of this matter, so that the words "mental illness", where they appeared in that section, now appear as "mental disorder".

ally or unintentionally physically injure herself or other persons; or (b) she was unable to care for herself so as to guard herself from physical injury or to provide for her own physical needs.

It appears to us that the evidence clearly and convincingly established that respondent was afflicted with mental illness. Dr. Dushkin testified respondent "presents all of the symptoms of a severe schizophrenic, paranoid type", and that "she is psychotic, delusional, hallucinatory, autistic and unpredictable in her ability to care for herself or her children." Both he and Dr. Maltz, in their certificates of need for hospitalization, gave opinions that respondent was in need of mental treatment.

Concerning the requirement that petitioner establish respondent was reasonably expected to intentionally or unintentionally physically injure herself or others, we are of the opinion that the only testimony having relation thereto is clearly to the contrary.

We turn now to the remaining question of whether or not there was clear and convincing proof of the requirement of the Code that, as a result of her mental illness, she was unable to care for herself so as to guard herself from physical injury or to provide for her own personal needs. The only testimony appearing in the record is in the testimony of Dr. Dushkin and respondent's husband. The doctor testified "she is unpredictable in her ability to care for herself * * *," and he stated this opinion was based upon his observation of her at the hospital. Her husband testified, "I am a little afraid for her when she is on the street because she gets really so wrapped up into these things that she doesn't know what she is doing. She will be walking down the street and she doesn't know what street she is on." In addition, he testified that before they were married she had slit her wrists. We note that Dr. Dushkin was not asked and did not provide any facts which were the basis of his statement of unpredictability. Neither was any inquiry made to him as to the possible significance of respondent's wrist slitting experience to her mental condition as he described it at the hearing. In any event, Dr. Dushkin gave no testimony indicating that respondent was unable to care for herself so as to guard herself from physical injury or that she was not able to attend to her own physical needs. The testimony of respondent's husband that sometimes "she doesn't know what street she is on" falls far short of the proof required to establish that she is unable to guard herself from physical injury. Furthermore, we have found no evidence in the record concerning any inability on her part to provide for her own physical needs.

■■ For the reasons stated, it is our opinion that petitioner failed to clearly and convincingly establish that respondent was a person in need of mental treatment.

In view of this holding, it will not be necessary to consider the remaining contention of respondent.

The order finding respondent to be a person in need of mental care is reversed.

Reversed.

BARRETT and DRUCKER, JJ., concur.