*In re* MAURY JANOVITZ.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* MAURY JANOVITZ, Respondent-Appellant.)

First District   (4th Division)   No. 79-1022

Opinion filed March 27, 1980.

James J. Doherty, Public Defender, of Chicago (Thomas W. Murphy, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., and Mark Richard Davis, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

The respondent, Maury Janovitz, was found to be a person subject to involuntary admission and was then ordered by the trial court to undergo involuntary hospitalization. (Ill. Rev. Stat., 1978 Supp., ch. 91½, par. 1—119.) Respondent appeals from this order, contending that the State failed to prove by clear and convincing evidence that he was a person subject to involuntary admission.

On February 16, 1979, a petition for involuntary admission was filed, alleging that respondent was subject to involuntary admission to a mental hospital in that he had threatened to kill his hospital roommate and that he had also threatened to "get" two members of the hospital staff. The petitioner was a registered nurse at Rush Presbyterian St. Luke's Hospital, where respondent was a patient.

A hearing on this petition was held on February 21, 1979, and the following facts were adduced: Robert G. Zadylak, a psychiatrist, testified for the State and indicated the respondent had been under his care for approximately 2½ years; that, during that period, respondent had to be hospitalized 23 times for psychiatric disorders; and that these prior

disorders involved symptoms of severe depression and suicidal thinking, which were consistent with respondent's symptoms at the time of the hearing. Dr. Zadylak related that on February 2, 1979, he received a telephone call from respondent. During this communication respondent said he intended to get a gun and kill his business associate, Manny Riba, and himself. Dr. Zadylak then notified Mr. Riba and the Glenview and Chicago police departments of respondent's stated intention. On that same day, respondent was hospitalized for combined treatment of his mental condition and a chronic lower lumbar condition, which he had recently aggravated.

On February 3, 1979, Dr. Zadylak examined respondent regarding his mental status. Dr. Zadylak found respondent still to be preoccupied with homicidal and suicidal thoughts. On February 19, 1979, Dr. Zadylak again saw respondent together with respondent's wife and a nurse. At that time, respondent stated that he had taken an overdose of pills, which he had saved, in an attempt to become "aggravated" so that he would be put in restraints and die in the hospital. At a subsequent meeting that day, respondent indicated that he wanted to kill himself.

Dr. Zadylak further testified that he saw respondent at the hospital on a regular basis from February 3, 1979, until the date of the hearing. The psychiatrist characterized respondent's behavior as quite sporadic and indicated that respondent's judgment and insight were "impaired." Dr. Zadylak stated that sometimes respondent was cooperative and at other times he was agitated; that he threatened the staff and other patients; and that, on one occasion, he had to be placed in restraints. As the result of the overdose incident, respondent was placed on "suicide risk" and continually watched by the hospital staff. In response to inquiries by the trial court, Dr. Zadylak testified that respondent's condition was highly variable. For example, this physician stated that two nights before the hearing respondent was intent on killing himself.

In the opinion of Dr. Zadylak, respondent could be reasonably expected, in the near future because of his behavior, to hurt himself or another person. Upon further questioning by the trial court, the psychiatrist testified to three separate diagnoses of respondent's condition: psychotic depressive response, personality disorder and chronic pain syndrome. Dr. Zadylak further testified that, while all three problems were active, "the acute problem is psychotic depressive response." When questioned as to the probability of respondent's injuring himself or other individuals, Dr. Zadylak indicated that the probability was very high.

On cross-examination, Dr. Zadylak stated that respondent had been suffering previously from chronic lumbar rheumatitis, which is an inflammation in the joints of an individual's lower back, spinal cord and

legs. According to Dr. Zadylak, this condition can cause extreme pain. Dr. Zadylak further testified that the death of respondent's mother, his brother's inoperable cancer condition, and a severe business loss in his association with Manny Riba were the precipitating causes of his depression. The psychiatrist also indicated that these were events to which most people would react with anger or depressive symptoms but would not necessarily become depressed for a prolonged period. Dr. Zadylak also stated that at times people might state things in response to extreme pain that they would not ordinarily say. Lastly, the psychiatrist informed the court that the pills which respondent took on February 19, 1979, were muscle relaxants and analgesics.

Respondent testified in his own behalf and denied telling Dr. Zadylak that he took the aforementioned pills because he wanted to die in restraints. Respondent maintained that he took this medication to relieve his back pain, which had become extreme. Regarding his telephone conversation of February 2 with Dr. Zadylak, respondent stated that he no longer had any intention to kill Mr. Riba or himself. However, he admitted that he still felt anger toward Mr. Riba because of the great financial loss he had suffered on his account. Further, respondent asserted that he had sought outpatient treatment from two other psychiatrists. On cross-examination, respondent denied telling Dr. Zadylak that he was going to kill Mr. Riba. However, he stated that he did tell Dr. Zadylak that he "wanted" to kill Mr. Riba and that he was "thinking seriously" of obtaining a weapon. Respondent did not deny making threats toward hospital staff or other patients or having been placed in restraints.

As stated above, respondent contends that the State failed to prove by clear and convincing evidence that he was a person subject to involuntary admission. We cannot agree with this contention.

In his initial contention, respondent cites section 1—11 of the 1967 Mental Health Code (Ill. Rev. Stat. 1977, ch. 91½, par. 1—11), which defined a person in need of mental treatment as the substantive standard for civil commitment. However, the Mental Health and Developmental Disabilities Code has repealed par. 1—11 effective January 1, 1979, by Public Act 80-1414. (Ill. Rev. Stat., 1978 Supp., ch. 91½, pars. 6—106 and 6—107.) The present proceedings were conducted entirely during 1979. Consequently, the pertinent standard for civil commitment is now found in section 1—119 of the Mental Health and Developmental Disabilities Code. This section provides:

"'Person subject to involuntary admission' or 'subject to involuntary admission' means:

(1) A person who is mentally ill and who because of his illness is reasonably expected to inflict serious physical harm upon himself or another in the near future; or

(2) A person who is mentally ill and who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm. * * *" Ill. Rev. Stat., 1978 Supp., ch. 91½, par. 1—119.

As stated above, respondent contests the sufficiency of the evidence of his mental illness, citing the aforementioned repealed standard for a person in need of mental treatment. We are of the opinion that this court is not bound by the restricted meaning of "mental disorder" under the old Mental Health Code. Section 1—119 of the new statute substitutes the term "mental illness" for the former term "mental disorder." Recently, our supreme court in *People v. Lang* (1979), 76 Ill. 2d 311, 325-27, 391 N.E.2d 350, implied that the term "mental illness" expands the scope of the provision that defines which individuals qualify as persons subject to involuntary admission.

■■■ In commitment proceedings such as the present case, Illinois courts have adopted use of the "clear and convincing" evidentiary standard. (*In re Stephenson* (1977), 67 Ill. 2d 544, 556-57, 367 N.E.2d 1273; see also *Addington v. Texas* (1979), 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804.) This standard has recently been codified. (Ill. Rev. Stat., 1978 Supp., ch. 91½, par. 3—808.) As applied in a mental health case, the requirements of the aforesaid standard have been defined by this court as follows:

"Where the issue involved is not the occurrence of an event, but the determination of an individual's mental condition, the State must prove that the individual is in need of mental treatment by clear and convincing evidence. The facts upon which a medical opinion is based must be established by clear and convincing evidence, and the medical testimony upon which the decision to commit is based must be clear and convincing." (*People v. Sansone* (1974), 18 Ill. App. 3d 315, 326, 309 N.E.2d 733.) After having carefully examined the record, we are of the opinion that the trial court's decision to designate respondent as a person subject to involuntary admission was supported by clear and convincing evidence.

Here, Dr. Zadylak testified that he had observed respondent for 2½ years in a doctor-patient relationship; that during this period, respondent was hospitalized some 23 times for similar mental disorders; and that, in addition to the diagnoses of personality disorder and chronic pain syndrome, respondent's primary problem was a psychotic depressive response. Dr. Zadylak also indicated that he based his diagnosis of respondent's psychotic condition on several examinations and interviews.

He also added that he had observed respondent on a regular basis while respondent was in the hospital. In support of Dr. Zadylak's assertion that he had intimate knowledge of respondent, we must point out that the psychiatrist was able to specify the stressful events which

precipitated the depression in question. These events caused respondent to threaten suicide and violence to other people. Under such circumstances, we are of the opinion that the evidence was clear and convincing concerning the history and causes of respondent's mental illness.

Respondent calls attention to Dr. Zadylak's statement to the effect that most people react to such personal tragedies, as respondent experienced, "with anger or depressive symptoms." Because of this, respondent argues that such events would cause most ordinary people severe depression. However, Dr. Zadylak stated specifically that under such circumstances most people would experience symptoms of anger and depressiveness only for a short period of time. It is evident from the record in the present matter that respondent's symptoms existed for a long duration.

Respondent next maintains that Dr. Zadylak was guilty of self-contradiction when he stated that a psychotic person "has no psychological events upon which to base his depression." However, an examination of the record shows that Dr. Zadylak was merely referring to the fact that the aforementioned events, which triggered respondent's threats of suicide and violence, came from the circumstances actually existing rather than from purely internal stresses.

■■ As with the issue of mental illness, respondent's dangerousness must also be established by clear and convincing evidence. (See *In re Sciara* (1974), 21 Ill. App. 3d 889, 896-97, 316 N.E.2d 153.) As outlined above, Dr. Zadylak indicated that, during a telephone conversation, respondent threatened to kill himself and a business associate. The seriousness with which the psychiatrist regarded these threats is evidenced by the fact that he notified the business associate and two police departments regarding respondent's intention. Respondent denied making these particular threats, but did admit that at that time he "wanted" to kill the associate and himself. Respondent also stated that he seriously thought of obtaining a weapon to carry out these threats. In addition, Dr. Zadylak testified that respondent had threatened the hospital staff and patients, had to be placed in restraints and had repeated his threats to kill himself. Although commitment may not be justified on the basis of threats alone, the trial court is not required to wait until someone is actually injured or until respondent injures himself prior to ordering commitment. (See *In re Graham* (1976), 40 Ill. App. 3d 452, 454-55, 352 N.E.2d 387.) In view of such testimony, we are of the opinion that respondent's dangerousness was established by the clear and convincing evidence of his repeated threats to kill himself and other individuals. In light of this, we cannot say that the trial court erred in finding respondent a person subject to involuntary admission.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.