THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* GREGORY BRADLEY, Respondent-Appellant.

(No. 59583;

First District (2nd Division)—September 24, 1974.

Paul Bradley and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and William F. Linkul, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This appeal arises from an order finding respondent, Gregory Bradley, in need of mental treatment and ordering his commitment to the Department of Mental Health pursuant to the Illinois Mental Health Code.[1] Respondent contends on appeal:

1. He was not proved to be in need of mental treatment;
2. Proper notice of the commitment hearing, as required by Section 7—6 of the Mental Health Code,[2] was not served upon respondent's wife; and
3. Respondent did not knowingly waive his right to a jury trial on the issue of his need for mental treatment.

In a petition for emergency hospitalization,[3] dated February 4, 1972, and signed by one Walter Borchard (described only as a "reputable citizen of Illinois"), respondent was alleged to be in need of mental treatment. Petitioner stated that the facts were established by the attached certificate of Dr. S. Lipkin. Petitioner alleged that an emergency existed, and that he believed that the respondent "is in such condition that he is likely to physically harm himself or others if not immediately hospitalized." The space provided for a summary of the facts upon which petitioner based his belief was left blank.

The petition was accompanied by a "Certificate of Need for Hospitalization" signed by S. Lipkin, M.D.[4] This certificate asserted that Dr. Lipkin is a licensed psychiatrist, and that he personally examined respondent on February 4, 1972 and found:

"Previously at Tinley State Hosp. Presently uncooperative, suspicious and self-protective without cause, loss of sense of reality

---

[1] Ill. Rev. Stat. 1971, ch. 91½, par. 1—1 *et seq.*

[2] Ill. Rev. Stat. 1971, ch. 91½, par. 7—6.

[3] Ill. Rev. Stat. 1971, ch. 91½, par. 7—1.

[4] Ill. Rev. Stat. 1971, ch. 91½, par. 7—1, provides that a petition for emergency hospitalization should be accompanied by a certificate of a physician.

and paranoid in his thinking. Behaviour becomes assaultive and uncontrolled on the slightest stimulation."

Dr. Lipkin certified that in his opinion respondent was in need of mental treatment and that he should be hospitalized immediately "for the protection from physical harm of himself and others."

The record also contains a second "Certificate of Need for Hospitalization." [5] This also purportedly was filed with the clerk of the court on February 4, 1972; however, it is not stamped filed. This certificate indicates that one Dr. Rebic, a licensed phychiatrist, examined respondent on February 8, 1972 (not on February 4, 1972), and found:

"Pt. withdrawn, suspicious, very resentful of physician interview. Vague, on guard and evasive when finally did allow himself into dialog. It was learned that he was arrested Jan. 18 at CCIL when he decided not to leve [sic] bedside of his wife. Dr. called the police. During the court appearance Judge charged him [with] contempt of court and sentenced him [to] 6 months to [sic] jail. He does not know of any reason why he was taken here in the middle of his sentence. He believes this is a 'railroad' or it was about 2 years ago when he was hosp. of [sic] Tinley and from there to Downey where he stayed a year and decided to leave on his own because 'they would not let him go.'

Pt. believes 'he cannot get fair trial in America' and is not going to give me a chance to alalize [sic] him and there is no use trying. He avoided relating on interpersonal level. Appeared preoccupied. I believe autistic and did say that all his life is based on anti-Americanism and when one day he gets chance to speak on Radio, TV and write for newspaper he'll express more to the point and we'll know what he has been concerned about. Pt. seems more depressed and more disturbed than he allows to meet the eye."

Dr. Rebic certified that in her opinion respondent was in need of mental treatment and that he be "hospitalized in a suitable public or private hospital." This certificate also contains a notation "paranoid state" written in the margin.

Also shown as filed on February 4, 1972 is a "Notice of Hearing" directed to respondent's wife, Debra Bradley.[6] A deputy sheriff noted

---

[5] This apparently is certification by a psychiatrist that the patient is in need of mental treatment. Such certification is required within 24 hours, excluding Saturdays, Sundays and holidays, of a patient's admission into a hospital (Ill. Rev. Stat. 1971, ch. 91½, par. 7—5). Because February 4, 1972, was a Friday, more than 24 hours elapsed before certification.

[6] Ill. Rev. Stat. 1971, ch. 91½, par. 7—6, requires reasonable notice of the time and place of the hearing to be served upon the patient's nearest relative.

that a copy was personally served on Mrs. Bradley on February 9, 1972. The notice was captioned "In the matter of Gregory Bradley ＊ ＊ ＊ asserted to be in need of mental treatment." Following this statement Mrs. Bradley was informed that on February 4, 1972, a petition was filed. The printed notice form then lists four explanations for the petition: "is in need of mental treatment and requires hospitalization," "is mentally retarded and requires hospitalization," "is in need of continued hospitalization," and "is not in need of mental treatment or hospitalization." None of these explanations were checked. Finally, the notice informed Mrs. Bradley that a hearing had been set for February 10, 1972, at 9:30 A.M. at 6500 Irving Park Road, Chicago, Illinois.

On February 9, 1972, a timely order for hearing on the petition was filed.[7] The hearing was set for February 10, 1972. The sentence on the order form "A jury be impanelled consisting of six persons" was stricken.

On February 16, 1972, the evidentiary hearing was held (the record does not reflect what proceedings, if any, occurred on February 10, 1972). Respondent elected to act pro se; an assistant public defender was present to "assist" him. The court initiated the proceedings by asking for "some background on the patient." A person identified only as a "Social Worker" then testified without objection that:

> "Mr. Bradley was previously hospitalized at Tinley Park transferred from Chicago State on July the 31, of 1970 and then was transferred at that date to Tinley Park. From 8/7/70 and was discharged 9/29/70. He was also at V.A. Hospital, Downey, in particular in 1971 from September until August. Patient, uh, was not cooperative with me and gave me very little information to his family background and as to what he was doing and as to why he was arrested. However, I did speak to his wife."

The "Social Worker" proceeded to state that respondent's wife related that she had been ill in the hospital and that because of that respondent had stayed in the hospital with her for over a week and would not leave until "his wife was ready to go." Security guards and police were summoned and respondent was taken to the House of Correction and then transferred "here" to Chicago State.

At this point respondent and the court entered into a lengthy colloquy whereby respondent related that a doctor at the hospital told him it was perfectly all right for him to remain with his wife. His wife was pregnant and he took care of her because "they didn't allow the special attention

---

[7] Ill. Rev. Stat. 1971, ch. 91½, par. 7—6, provides that after the petition and certificate are filed with the clerk, he "shall immediately present them to the judge ＊ ＊ ＊ who shall set them for hearing at a time not more than 5 days, excluding Saturdays, Sundays and holidays, after the admission of the patient to the hospital."

that she needed at the time." This was his wife's third eye operation. Hospital personnel told him to go home and rest. Respondent answered that he would like to stay at least a day or two after the operation. The woman doctor told him he could not and "the next thing I knew the guards came in." This incident occurred at approximately 8 or 9 P.M. Respondent told the court:

> "I wasn't aware of the fact, if I didn't leave she would go get the officers. Under those circumstances I would have left, but I wasn't informed and I thought, just realize, my concern and let me, allow me to stay."

The court responded: "Yes, Well, must have been more to it. You must have refused to leave."

Dr. Rebic, in response to the court's questioning, then testified as to her examination of respondent subsequent to his admission into the hospital. Dr. Rebic found respondent to be very tense during the interview, "He kept his hands, completely withdrawn and distant." During the course of the interview respondent stated that he did not intend to cooperate. Respondent would not "discuss the pertinent issue," or "go into details." Respondent related to Dr. Rebic that he was arrested in Cook County Hospital at the bedside of his wife who had undergone her third eye operation. He stated that "he did not trust to leave her alone with the professional people there. He felt there [sic] not going to give her the right treatment." Respondent stated that he had a right to be concerned, but he refused to explain his suspiciousness. He related that he decided to remain at the hospital, the doctor asked him to leave and told him he would call the police. Respondent refused to leave and when the police arrived he resisted arrest.

Dr. Rebic testified that she "couldn't get him to talk about what did happen in the Courtroom, that they said he was disorderly and was fighting with the bailiffs," and that therefore she "had to use the record quite a bit." At this point the assistant public defender raised a hearsay objection which the court sustained. Dr. Rebic then stated that respondent related to her prior to the hearing that "he could not tolerate the treatment in the Courtroom, simply, decided he's not going to cooperate and did fight with the bailiffs." He was sent to County Jail prior to being transferred to the hospital.

Dr. Rebic further testified that respondent felt that he could not receive a fair trial in America; that his life was "Anti-American"; that Dr. Rebic would not understand anything he told her; that he was "railroaded" at Downey and this hospitalization was a "railroad"; that he was charged with selling Panther literature at the time of the Panther trial and he resisted arrest and was sent to Tinley Park and then Downey.

Dr. Rebic related that respondent was unemployed and that he expressed concern for the mistreatment of his family and his race, concern with America, the sexual revolution, "all of the books written, all of the movies made." Respondent stated that when he has access to the communication media, he will let the world know his thoughts.

Dr. Rebic then stated her conclusions from the interview:

"It is impossible to elicit any delusional material, simply, because the patient would not respond to this type of questioning.

                *     *     *

He did not offer any spontaneous conversation  *  *  *. I asked about hallucinatory experiences, if he had any, although I had my doubts that he did. He said, he laughed and he said, he never had these why would I ask such a question. Now what was left for me to observe was generally his attitude which was suspicious, his speech evasive and a marked guard. There was no way to get him engaged in any relevant conversation. He was borderline agitated, quite anxious, very tense  *  *  *. Was most definitely not willing to talk to me.

                *     *     *

[I]t was very difficult for me, very difficult to decide if he's schizophrenic, paranoid, very much so at this time. My impression was simply considering the previous hospitalization of one year duration and him now at the present time that the patient is suffering from some kind of paranoid state which I'm not quite able to define.

                *     *     *

I would recommend hospitalization.

                *     *     *

I don't believe this patient is able to conduct himself as he showed in a time of much pressure. It's just simply difficult to elaborate on and I don't believe that he's going to be able to take care of himself adequately.

                *     *     *

He doesn't seem to be concerned of the relevant things, a job and his conduct.  *  *  *  This young man is preoccupied, he just very difficult to elaborate on it, because he doesn't let anything out."

Dr. Rebic answered affirmatively to a question by the assistant State's Attorney as to whether the incident in the hospital and the incident in the courtroom indicated that "he conceivably could be a danger to himself or others." Dr. Rebic commented that respondent was not discharged from Downey, but left of his own accord.

Respondent then made a statement to the court that at the time of the interview with Dr. Rebic, his tenseness was caused by medication he had received. Respondent also explained the incident in the courtroom: He was speaking and the judge was talking. A bailiff grabbed him and he turned around and swung. Twenty policemen then beat him. Respondent stated, in response to Dr. Rebic's opinion, that after he left Downey he took care of his wife until she recovered. The court inquired of respondent's stay in Tinley Park and respondent answered that he was there for 1 month and in Downey for 1 year and was then discharged.

The court found respondent to be suffering from mental illness, as a result of which "he's likely to cause harm not to himself particularly, but to other people  *  *  *." Respondent was found to be in need of mental treatment and was ordered hospitalized for treatment.

The Illinois Mental Health Code defines a person in need of mental treatment as one, who as a result of his mental illness,

"*  *  * is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself  *  *  *." [8]

■■ Respondent's first contention is that he was not proved to be in need of mental treatment. In his brief he argues that the burden of proof in civil commitment proceedings must be beyond a reasonable doubt. In a recent opinion, which considered at some length the authorities cited by respondent here, this court resolved this precise issue. In *People v. Sansone*, 18 Ill.App.3d 315, 309 N.E.2d 733, leave to appeal denied May 29, 1974, we rejected a reasonable doubt standard of proof and held that the State must prove that an individual is in need of mental treatment by clear and convincing evidence:

"The facts upon which a medical opinion is based must be established by clear and convincing evidence, and the medical testimony upon which the decision to commit is based must be clear and convincing. 18 Ill.App.3d 315, 326."

■■ In *Sansone* we recognized that a matter of paramount importance in an involuntary civil commitment proceeding is the right of the individual to be free of unjustified and unreasonable confinement. From our scrutiny of the entire record in this case, we conclude that the evidence adduced is insufficient to support a finding that respondent is in need of mental treatment. Neither the facts upon which Dr. Rebic's medical opinion was based, nor the medical opinion itself are clear and convincing. The decision to commit respondent was based upon (1) the

---

[8] Ill. Rev. Stat. 1971, ch. 91½, par. 1—11.

incident at the hospital; (2) the incident in the courtroom; (3) respondent's previous hospitalization; and (4) Dr. Rebic's observations of respondent's demeanor and her medical opinion.

■■ Initially we note that criminal charges alone are insufficient evidence that a person may reasonably be expected to harm himself or others. (*Cf. Jackson v. Indiana*, 406 U.S. 715.) However, it is clear that conduct which is the subject of criminal prosecutions may provide the basis for a medical opinion that a person may be likely to cause physical injury, and for a finding that a person is in need of medical treatment.

In the instant case the facts concerning the hospital incident were established by (1) the hearsay testimony of an unidentified social worker who stated that respondent's wife related that he would not leave the hospital until she was discharged; (2) Dr. Rebic's testimony that respondent told her that he refused to leave the hospital and he resisted arrest; and (3) respondent's own testimony that he was concerned about his wife and wanted to remain with her, but that he would have left voluntarily if he had known that police were going to be called. From this evidence, it cannot be said that the State proved by clear and convincing evidence that respondent's conduct was violent or assaultive at the hospital.

Likewise, we do not believe that the evidence adduced by the State regarding the incident in the courtroom clearly and convincingly established that respondent, without provocation, initiated the scuffle in the courtroom. Respondent's testimony was that he was brought to court and there assaulted from behind; he responded by turning and swinging. Dr. Rebic testified that respondent would not speak of the incident and that she relied on the "record." She then altered her position somewhat and stated that respondent told her that "he could not tolerate the treatment in the courtroom" and that consequently he fought with the bailiffs. Dr. Rebic's testimony does not in any material way contradict respondent's testimony of the incident. The only competent evidence adduced indicated that respondent did not initiate the scuffle. Respondent's action cannot be condoned; however, under the circumstances of his wife's illness and his arrest at the hospital, it becomes more understandable.

■■ The State urges that the incident at the hospital and the incident in the courtroom, taken together, "exhibit respondent's propensity to resort to violence." We do not agree. The "facts" adduced by the State were unclear, and in some instances, were merely hearsay.

Evidence of prior hospitalization was adduced and corroborated by respondent. However, due process requires that a decision to commit be based upon a fresh evaluation of an individual's conduct and state of mind and not upon prior hospitalization or prior commitment proceed-

ings. (*Cf. People v. Sansone, supra.*) Evidence of prior hospitalization, together with facts underlying that hospitalization, may, of course, be relevant factors in the prediction of future behavior. However, here the sole fact adduced was prior hospitalization.

■■ Moreover, we conclude that the medical opinion that respondent conceivably could cause harm to himself and others does not meet the clear and convincing standard set forth in *Sansone*:

> "[W]e are of the opinion that a decision to commit based upon a medical opinion which clearly states that a person is reasonably expected to engage in dangerous conduct, and which is based upon the experience and studies of qualified psychiatrists, is a determination which properly can be made by the State.
>
> : * * * [A] finding must be based upon an explicit medical opinion regarding the patient's future conduct, and cannot be based upon a mere finding of mental illness." 18 Ill.App.3d 315, 323.

In the instant case Dr. Rebic's explicit medical opinion was that respondent was suffering from a mental illness and that he should be hospitalized. However, as stated in *Sansone*, this finding of mental illness cannot alone sustain an order requiring commitment to a mental hospital. An explicit medical opinion must be rendered that, based upon the patient's conduct, it is reasonably expected that he will harm himself or others or will be unable to care for himself. The medical opinion rendered here does not meet this standard. Dr. Rebic's diagnosis was equivocal and unclear. She found it "difficult to decide if respondent was schizophrenic, paranoid." Her "impression" was that, based upon his previous hospitalization and his present demeanor, he was "suffering from some kind of paranoid state which I'm not quite able to define." In answer to the assistant State's Attorney's question as to whether respondent "conceivably could be a danger to himself or others," Dr. Rebic answered affirmatively.

■■ Perhaps Dr. Rebic's difficulty in diagnosing and rendering an opinion arises because the "facts" upon which her opinion was based do not clearly and convincingly lead to a conclusion of likelihood of harm or injury. Therefore, the most that could be said is that respondent could "conceivably" be dangerous. In *Sansone*, we recognized that the science of predicting future behavior is inexact and that a psychiatrist cannot assure infallibility of his prediction. However, the tenuous medical opinion rendered in the instant case cannot be a basis for commitment pursuant to section 1—11 of the Mental Health Code.

We also note that Dr. Rebic found respondent to be unable to care for himself. However, the trial court did not base its decision to commit

on this opinion. In any event, this opinion was based upon respondent's seeming unconcern for "relevant things," *i.e.*, a job, "his conduct." Suffice to say that we are not convinced that the facts adduced in this regard present a sufficient basis for such an opinion.

To hold that a medical opinion that an individual could "conceivably" be dangerous, based upon such facts as appear in this record, is adequate to support a decision to commit for emergency hospitalization would be a total disregard of an individual's right not to be unjustly or unreasonably confined. The evidence adduced in the instant case by no means approaches the quantum of proof established in *Sansone*. There a psychiatrist and a social worker, both of whom interviewed Sansone on two different occasions, testified without contradiction as to Sansone's delusions regarding law and law enforcement officers. The psychiatrist testified that Sansone's statements and actions "strongly" indicated that he believed "people are after him," and that persons whom the psychiatrist had known with the same type delusions had injured or attempted to injure others. Therefore, in *Sansone*, unlike in the instant case, the facts adduced and the medical opinion led to a clear finding that the patient could reasonably be expected to injure others, and that therefore, the patient was in need of mental treatment. The facts and medical opinion here have not been established by clear and convincing evidence, and accordingly, the decision to commit must be reversed. See *People v. Sciara*, 21 Ill.App.3d 889, 316 N.E.2d 153.

■■ In view of the nature of civil commitment proceedings, we deem it advisable to consider respondent's additional contentions. Respondent argues that his wife received improper notice of the hearing. Section 7—6 of the Mental Health Code[9] provides:

> "[R]easonable notice of the time and place of the hearing be served upon the patient, his attorney, if any, and the persons entitled to receive a copy of the petition pursuant to Section 7—4."

It is undisputed that the notice of the hearing was served upon respondent's wife and that it did indicate the time and place of the hearing. In those respects the notice complied with the statutory requirements. Respondent's argument is based upon the fact that, because the printed notice form contained four possible explanations as to the purpose of the hearing and none of these had been checked, Mrs. Bradley was not notified of the purpose of the hearing. However, we note that section 7—4 of the Code requires that a copy of the *petition* be served upon the patient's nearest relative, and therefore, we assume that Mrs. Bradley received a copy of the petition (the record is silent as to this

---

[9] Ill. Rev. Stat. 1971, ch. 91½, par. 7—6.

fact, as are the briefs). The petition informed her that proceedings had been initiated for the hospitalization of her husband. Additionally, the notice of hearing referred to the petition and indicated that respondent was asserted to be in need of mental treatment. Under these circumstances, there is no merit to the contention that Mrs. Bradley received no notice of the purpose of the hearing.

■■ Respondent's final argument, that he did not knowingly waive his right to a jury trial, is premised upon the related contention that due process requires a right to a jury trial in involuntary civil commitment proceedings. In *People ex rel. Keith v. Keith*, 38 Ill.2d 405, 231 N.E.2d 387, our supreme court held that the Illinois Constitution of 1870 does not require a jury trial in civil commitment proceedings. The right to trial by jury in special statutory actions exists, not by virtue of any constitutional requirement, but by virtue of the rights conferred under these acts by the legislature. *People v. Studdard*, 51 Ill.2d 190, 281 N.E. 2d 678.

■■ Our supreme court, in *People v. Studdard, supra*, has recently held, in proceedings pursuant to the Illinois Sexually Dangerous Persons Act, that due process of law does not require a right to trial by jury as in criminal matters nor the safeguards surrounding the waiver of jury trial as in criminal matters. We are of the opinion that the rationale in *Studdard* is applicable in proceedings under the Illinois Mental Health Code.[10] Section 9—2 of the Code provides that a patient, his attorney or relative may *demand* a jury trial. We find nothing in this provision which violates due process of law. There is a significant difference between a waiver of an existing constitutional right and a failure to comply with a condition precedent to the existence of a statutory right. Accordingly, we reject respondent's contention that he did not knowingly waive his right to a jury trial.

For the foregoing reasons, we reverse the order of commitment.

Reversed.

HAYES, P. J., and DOWNING, J., concur.

---

[10] Ill. Rev. Stat. 1971, ch. 91½, par. 9—2.