*In re* ROGER LOVE, Asserted to be in Need of Mental Treatment.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* ROGER LOVE, Respondent-Appellant.)

First District (4th Division)   No. 63132

Opinion filed April 21, 1977.

James J. Doherty, Public Defender, of Chicago (Aaron L. Meyers, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, and Jeffrey Singer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

Roger Love, respondent, appeals the trial court's decision finding him to be a person in need of mental treatment and committing him to the Chester Mental Health Center. Respondent contends that the State failed to prove by clear and convincing evidence that he was a person in need of mental treatment and required commitment.

We affirm.

## FACTS

On February 20, 1975, a representative of the Department of Mental Health filed a petition for the hospitalization of respondent. The petition alleged that respondent was a person in need of mental treatment as defined by section 1—11 of the Mental Health Code. (Ill. Rev. Stat. 1973, ch. 91½, par. 1—11.)[1] On the same day, a "certificate of need for hospitalization" was filed by a licensed psychiatrist, Dr. Jewett Goldsmith. The next day, a second "certificate of need for hospitalization" was filed by another licensed psychiatrist, Dr. Basil Siomopoulos.

On March 7, 1975, a hearing was held before the Honorable Cornelius J. Collins at the Illinois Psychiatric Institute. Dr. Siomopoulos and Dr. Goldsmith testified that each had conducted a formal psychiatric interview of respondent and diagnosed him as a chronic schizophrenic. Each psychiatrist concluded that respondent was unable to care for himself and was in need of mental treatment.

Dr. Siomopoulos based his conclusion, in part, on the fact that in addition to being mentally ill, respondent suffered from a chronic case of tuberculosis. While Dr. Siomopoulos acknowledged that he was unaware of any link between schizophrenia and tuberculosis, he asserted that respondent's contraction of the physical illness caused him to doubt respondent's present ability to provide himself with the necessary nutrients to maintain good health. Furthermore, Dr. Siomopoulos stated that respondent was unable to hold a job, communicate with others, or function meaningfully in the community.

When asked whether the fact that respondent lived on his own from 1971 to 1974 indicated that respondent could manage his own affairs and care for himself, Dr. Siomopoulos answered that he was unable to make a judgment about respondent's mental status of a few years before. Rather, Dr. Siomopoulos asserted that based upon respondent's current mental status, respondent would presently be unable to care for himself.

Dr. Goldsmith also expressed doubt about respondent's present ability to care for himself, even though Dr. Goldsmith agreed with counsel for

---

[1] As disclosed by the petition for hospitalization, on February 7, 1975, respondent was found unfit to stand trial on a charge of murder.

respondent that the fact that respondent lived on his own for a few years might superficially indicate that respondent at one time could care for his basic needs and well being. However, Dr. Goldsmith asserted that respondent showed "great disturbance of thought content and disturbance of thinking ability" which could adversely affect respondent's present ability to care for his basic needs or to seek treatment for his tuberculosis.

Dr. Goldsmith pointed to specific factors which illustrated respondent's chronic thought disorder. Dr. Goldsmith testified as to respondent's unfounded belief that respondent had won money in a magazine contest and respondent's complaint that the staff of a mental hospital had withheld the prize from him; respondent's feeling that "wind blew into his head," causing him to put paper in front of his ear to keep the wind from blowing through; and respondent's conviction that "there was something wrong with his right foot that made dogs want to suck that foot."

In addition Dr. Goldsmith related that respondent displayed great hostility towards respondent's father and brother, believing that they were partly responsible for an incident at a mental hospital where respondent claimed he had been wrapped in a blanket and beaten and kicked. Dr. Goldsmith testified that respondent expressed thoughts of killing his father and brother. However, Dr. Goldsmith observed that "this was all told in a vague and somewhat irrelevant way which made it difficult to follow." Dr. Goldsmith concluded that he could "see him [respondent] in certain situations as perhaps if he has contact with his family being potentially dangerous to him [sic]."

After the doctors testified, respondent was asked if he agreed with their findings and recommendations. In response, respondent referred to an operation which he felt had been performed against his will.[2] Because of this past experience, respondent related that he did not want to go back to the hospital. Respondent further volunteered that he did not have an alcohol or drug problem. Respondent also stated that after he escaped from Manteno State Hospital, he supported himself by day labor work. He rented a room and ate satisfactorily. Respondent said he was not aware of his tuberculosis and explained that he "could not come to a conclusion whether it came from alcohol. I did not have a drug problem, and I eliminated alcohol and drugs while I was in society."

At the conclusion of the hearing, Judge Collins found respondent to be in need of mental treatment and ordered him committed to the Chester Mental Health Center.

---

[2] Dr. Siomopoulos explained this incident more fully in his testimony: "He [respondent] vaguely referred to a Doctor at Manteno [mental hospital] who, according to Mr. Love, did not like him, and in a rather obscure way he believe [sic] this doctor responsible for a hernia operation that Mr. Love had while he was at Cook County Jail."

Opinion

The Mental Health Code (Ill. Rev. Stat. 1973, ch. 91½, par. 1—11) defines persons "in need of mental treatment" as:

> " * * * any person afflicted with a mental disorder, * * * if that person, as a result of such mental disorder, is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs. * * *"

■■ Accordingly, in order to establish that a person is in need of mental treatment, the State must prove at the outset that the person is suffering from a mental disorder. (*People v. Ralls* (1974), 23 Ill. App. 3d 96, 318 N.E.2d 703; *In re Sciara* (1974), 21 Ill. App. 3d 889, 316 N.E.2d 153.) However, a finding of mental illness alone cannot sustain an order requiring commitment to a mental hospital for treatment. (*People v. Bradley* (1974), 22 Ill. App. 3d 1076, 318 N.E.2d 267; *People v. Sansone* (1974), 18 Ill. App. 3d 315, 309 N.E.2d 733.) To support an order of commitment for treatment, the State further must submit an explicit medical opinion asserting that as a direct result of such mental illness, the person presently is unable to care for his physical well being. Additionally, the medical opinion must be based upon direct observation of the person's conduct. (*People v. Bradley* (1974), 22 Ill. App. 3d 1076, 318 N.E.2d 267.) Alternatively, a medical opinion illustrating that the individual potentially may harm himself or others is another ground for concluding that a person is in need of mental treatment and should be hospitalized. *In re Stephenson* (1976), 36 Ill. App. 3d 746, 344 N.E.2d 679.

In *People v. Sansone* (1974), 18 Ill. App. 3d 315, 309 N.E.2d 733, our court held that the standard of proof required for commitment because of mental illness is one of clear and convincing evidence. Recognizing that a person's liberty is at stake, the court required a quantum of proof greater than a preponderance of the evidence. The court stated:

> "Where the issue involved is not the occurrence of an event, but the determination of an individual's mental condition, the State must prove that the individual is in need of mental treatment by clear and convincing evidence. The facts upon which a medical opinion is based must be established by clear and convincing evidence, and the medical testimony upon which the decision to commit is based must be clear and convincing." *People v. Sansone* (1974), 18 Ill. App. 3d 315, 326, 309 N.E.2d 733, 741.

■■ In the instant appeal, respondent contends that the *Sansone* requirements were not fulfilled. Respondent urges that the commitment order must be vacated since there were no facts adduced at the

commitment hearing which supported the psychiatrists' testimony that respondent was unable to care for himself. We disagree.

Respondent concedes and we concur that the facts adduced showed the respondent to be suffering from a mental illness. Both Dr. Siomopoulos and Dr. Goldsmith diagnosed respondent as a chronic schizophrenic. Dr. Siomopoulos stated that respondent "showed evidence of thought disorder manifested mainly in delusional disassociations as well as vague delusional ideas." In addition, the doctor found that the respondent believed himself to be receiving "vibrations." The respondent refused to discuss the matter in depth because of the respondent's suspicious and guarded nature. Dr. Goldsmith testified that respondent evidenced "great disturbance of thought content and disturbance of thinking ability." Dr. Goldsmith further described several examples illustrating respondent's thought disorder. We believe clear and convincing evidence was adduced at trial to support the finding of mental illness.

■■ The key dispute in this case arises, however, over whether the State established, by clear and convincing evidence, that as a direct result of his mental illness, respondent was unable to care for himself and was thus in need of commitment for his mental treatment. We believe that the State carried out its burden of proof in this regard.

Each psychiatrist indicated his belief that respondent was presently unable to care for himself. Each psychiatrist based his opinion, in part, on the fact that in addition to respondent's mental illness, respondent was suffering from a chronic physical ailment. The doctors expressed concern that respondent's thought disorder could manifest itself into a present inability to seek treatment for his tuberculosis. Although there was no evidence brought forth that respondent contracted tuberculosis as a result of his schizophrenia, we note that in order to sustain a finding of in need of mental treatment, it is present and future, and not past ability to care for oneself that is to be considered. (*People v. Sansone* (1974), 18 Ill. App. 3d 315, 309 N.E.2d 733.) We likewise find that any evidence that respondent lived on his own and supported himself for a few years after his escape from a mental hospital, bears only upon respondent's past ability to care for himself. Accordingly, we defer to Dr. Siomopoulos' opinion that respondent is presently unable to care for himself, hold a job, communicate with others or otherwise "function meaningfully in the community." Based upon similar testimony by Dr. Siomopoulos, we recently held in *People v. Williams* (1977), 47 Ill. App. 3d 861, ____ N.E.2d ____, that there was clear and convincing proof that respondent, a schizophrenic, was unable to care for himself.

Additionally, here we have a man sorely in need of medical treatment for a serious ailment who potentially may refrain from seeking help

because of his mental illness. In *People v. Sansone* (1974), 18 Ill. App. 3d 315, 322, 309 N.E.2d 733, 738, the court described the State's duty in regard to a civil commitment proceeding:

> "Inherent in civil commitment proceedings is the promise of the State, under a *parens patriae* theory, that the person who is being deprived of his liberty will receive treatment."

Furthermore, we recently noted in *People v. Williams* (1977), 47 Ill. App. 3d 861, ___ N.E.2d ___, that:

> " * * * the hazards and stresses of everyday life can strain the coping mechanisms of the average citizen. The person who is distressed by a crippling mental illness is sadly deficient in the resources required to meet the challenges of everyday living and is highly vulnerable to these pressures. A person who may not be overtly suicidal or homicidal may nevertheless still require the protections which legal processes afford if his mental illness renders him incapable of functioning in a responsible fashion."

The evidence presented in this case clearly indicates that the respondent requires commitment for treatment of his mental illness.

In briefly considering if the State additionally proved that respondent should be committed for mental treatment on the grounds of dangerousness to himself or others (Ill. Rev. Stat. 1975, ch. 91½, par. 1—11), we note that the record is devoid of any substantial evidence to support such a finding. While Dr. Goldsmith indicated that respondent was potentially dangerous to his father and brother due to his great hostility towards them and his thoughts of killing them, Dr. Goldsmith explained that any threats were told "in a vague and somewhat irrelevant way."

■■ Lastly, we observe that respondent was found unfit to stand trial on a charge of murder. However, having no knowledge of the circumstances under which such charge was brought, we may not consider this factor as bearing upon respondent's potentiality for dangerousness. See *In re Stephenson* (1976), 36 Ill. App. 3d 746, 344 N.E.2d 679; *People v. Bradley* (1974), 22 Ill. App. 3d 1076, 318 N.E.2d 267.

Inability to care for oneself is a sufficient basis to sustain an order of commitment of one in need of mental treatment. The record in this case and the applicable law amply supports the trial court's ruling. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

DIERINGER, P. J., and ROMITI, J., concur.