*In re* BETTY GREGOROVICH.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* BETTY GREGOROVICH, Respondent-Appellant.)

First District (5th Division)    No. 79-1423

Opinion filed September 26, 1980.

Ralph Ruebner and Bradley S. Bridge, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Raymond J. Prosser, and Mark R. Davis, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

This is an appeal by respondent from an order entered in the circuit court of Cook County, finding her to be a person subject to involuntary admission under the provisions of the Mental Health and Developmental Disabilities Code. (Ill. Rev. Stat. 1979, ch. 91½, pars. 1—100, 1—119.) On appeal, respondent contends (1) the State did not prove by clear and convincing evidence that she was a person subject to involuntary admission, and (2) the court should not have considered the testimony of one of

the psychiatrists who testified at the hearing because he failed to inform respondent that she had a right to refuse to speak to him as required by Section 208 of the Mental Health and Developmental Disabilities Code. Ill. Rev. Stat. 1979, ch. 91½, par. 3—208.

On May 9, 1979, respondent's mother, Celia Gregorovich filed a petition for involuntary judicial admission, alleging that respondent was reasonably expected to inflict serious physical harm upon herself or another in the near future and was unable to provide for her basic physical needs so as to guard herself from serious harm and that she was in need of immediate admission for the prevention of such harm. The petition alleged that respondent had threatened to harm herself and her mother after she had cut all the cords to the electrical lamps and television.

The following pertinent evidence was adduced at the hearing on May 9, 1979.

### Celia Gregorovich

Her husband, respondent's father, had been sick for 7 years with Parkinson's Disease and had been hospitalized since January 1979. Respondent, who was 21 years of age, blamed her mother for her father's illness, started talking to herself and would not eat. About a month earlier, when respondent cursed her, she struck respondent with a broom, and respondent then scratched her hand with her nails. The scratch marks took 3 weeks to heal. When she asked respondent to lower the television volume, respondent cut the television wires with scissors. Respondent then held the scissors in her fist, with the point sticking out, and pointed them at her mother, who was about 2 or 3 feet away. When respondent put down the scissors, Mrs. Gregorovich called the police. On cross-examination, she testified she did not have to seek medical attention when respondent scratched her hands, and respondent had never physically harmed her before this or tried to hurt herself. She further indicated respondent took care of herself at home and was very clean and neat about herself.

### Gregory Nooney, mental health worker at Northwestern Hospital

Respondent, who was hospitalized at Northwestern, said she would not change her clothes until she went to court because that would prove she was not crazy; she slept in her clothes and had not bathed although she was eating. Respondent told him she knew that mental patients often had symptoms similar to ESP and she wanted to prove that she had ESP and that she was not crazy. On cross-examination, he testified respondent had never attacked any other patient on the hospital unit or caused any physical harm to anyone.

### Dr. David Altman, a board certified psychiatrist

He examined respondent on May 4, 1979. Respondent was sitting on the couch, moving her mouth and gesturing toward the television set which

was turned on. When he was introduced to her, respondent yelled at him, then turned back toward the television set and continued to gesture toward it. When he attempted to engage her in a conversation, she moved to another part of the room and continued to face the television and gesture toward it. When he saw that respondent was becoming more upset, he told her he would stop, and respondent became calm and laughed in the direction of the television set. This process was repeated during the day on May 4. He also observed respondent in front of the television on other occasions when she would at times be watching the television with other patients, moving her mouth and occasionally making gestures. He spoke to her again the morning of the hearing, May 9, when respondent was again in front of the television set. She told him she did not want to talk to him, and the only information he was able to obtain from the interview was that respondent believed that it was dangerous for her to be in the hospital and that she would gain more ESP power from other patients and this would be dangerous. When he asked her to elaborate, respondent said that she would explain it to the judge.

In his opinion, based on information he received from other members of the staff and based on his contact with respondent, she was suffering from an acute schizophrenic episode, a mental illness involving auditory and visual hallucinations. He believed she was under a delusion, a fixed false belief, since she thought she had the power to control people's minds and read other person's minds. He concluded that respondent would be unable to take care of her basic physical needs and protect herself against physical injury based on the fact that she cut the electrical wires prior to admission, that she was quite hostile, that she refused a physical examination and routine laboratory work upon admission because it would somehow prejudice her case, that she thinks she has extra sensory powers rather than having a mental illness, and that she had not bathed and was "essentially not caring for herself in a manner which she would need to do in order to be released." He recommended that she continue to be hospitalized although she had not inflicted injury on herself or anyone else in the hospital.

On cross-examination Dr. Altman testified that he advised respondent of her statutory rights that she did not have to talk to him. Ill. Rev. Stat. 1979, ch. 91½, par. 3—208.

*Dr. Sydney Wright, licensed physician and psychiatric resident at Northwestern Memorial Hospital*

He examined respondent on May 3, 1979. Respondent told him she felt she was being brought into the hospital against her will. In an effort to demonstrate her dissatisfaction about being brought to the hospital, she kicked a police officer when she was being escorted to Northwestern Hospital. Respondent told this doctor that she had received ESP powers,

but that people doubted that she had these powers. She said she had been involved in a power struggle with another person called Jeffery who had ESP and lived in Philadelphia and who had sent her ESP messages that he loved her; but she subsequently became aware of the fact that he wished to harm her and became involved in an ESP power struggle with him in which he attempted to kill her. She believed her ESP powers may have killed Jeffery since she had not recently heard from him.

Respondent also told him she had cut the television cord because God had told her to do so, and she became convinced that a university was "bugging" her house and was receiving information about her activities which would end if she cut the cord. She also stated that she was going to kill her mother.

In his opinion, respondent was suffering from a mental illness and would be unable to take care of her basic physical needs to protect herself against physical injury. Dr. Wright also noted that respondent showed gross disorganization of her thought processes characterized by concrete thinking, a looseness of association, and a marked pressure of speech. When asked if she might intentionally or unintentionally harm others, he answered, "I believe that is a possibility based on her statements to me." When asked if she was more likely than not to harm herself or others without further treatment, he related another episode which occurred the day following hospitalization. When the nurse assigned to work with respondent approached respondent, she told her she was a whore and would have nothing to do with her.

When he was again asked if it was more likely than not without further treatment that respondent might intentionally or unintentionally harm someone within a reasonable time, Dr. Wright responded: "Well, it is very difficult for me to predict the future. I would say there is a possibility she could harm someone." He recommended that respondent remain in the hospital for continued treatment. This course of action was based on respondent's statements to him that she believed her powers were sufficient to kill another individual, that she wanted to kill her mother and that she had an "aggressive and hostile stance toward specific staff members." He concluded, "I would say there is a possibility she could injure someone."

*Respondent, on her own behalf*

She would get out-patient treatment if she were discharged. On cross-examination, when asked why she would not accept out-patient treatment at Northwestern Hospital, respondent explained that she was not told why she was there and that she was taken there forcibly even though she did not do anything violent. When asked if she needed any help from a mental point of view, she answered, "Possible, but I don't think so, I just need someone to talk to." She admitted she had "mental problems" in the past

but had "got over it." When asked if there was anything currently wrong, she mentioned her mother saying, "but, if you knew my mother you would understand."

OPINION

Section 1—119 of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1979, ch. 91½, par. 1—119) defines persons subject to involuntary admission as:

> "(1) A person who is mentally ill and who because of his illness is reasonably expected to inflict serious physical harm upon himself or another in the near future; or
>
> (2) * * * who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm."

The State is required to prove that respondent is a person subject to involuntary admission by clear and convincing evidence. (Ill. Rev. Stat. 1979, ch. 91½, par. 3—808; *In re Stephenson* (1977), 67 Ill. 2d 544, 556, 367 N.E.2d 1273; see *Addington v. Texas* (1979), 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804.) Respondent argues she was not proven to be a person subject to involuntary commitment in that it was not established that she was unable to provide for her basic physical needs so as to guard herself from serious harm. The State does not address this argument in its brief; however, we do not consider the evidence establishes respondent was unable to take care of her basic physical needs so as to guard herself from physical harm.

Respondent also argues there was insufficient evidence that she was reasonably expected in the near future to inflict serious physical harm upon herself or another. For reasons set forth below we conclude that the evidence presented in this case was clear and convincing that respondent was mentally ill and because of this was reasonably expected to inflict serious physical harm upon another person in the near future.[1]

Under the former Act, the Mental Health Code of 1967 (Ill. Rev. Stat. 1977, ch. 91½, par. 1—11), a person in need of mental treatment was defined as any person afflicted with a mental disorder who, as a result, "is reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself or other persons, or is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs." At least for the purposes of this case, we do not find the minor differences in

---

[1] We do not, therefore, find it necessary to consider whether the evidence was sufficient to . show she was likely to harm herself. On this point, see *In re Evans* (1980), 86 Ill. App. 3d 263, 408 N.E.2d 33.

the language of the two statutes to be of controlling significance. We therefore have considered decisions under the former law in reaching our conclusion in this case.

In this regard we note that the Illinois legislature did not adopt the substantive standard recommended by the Governor's Commission for Revision of the Mental Health Code which would have added a requirement of a recent overt act or serious threat of physical harm; the proposed language was as follows (Governor's Commission for Revision of the Mental Health Code of Illinois, Report, Part One, at 13-14 (1976)):

"Section 1—119. 'Person subject to involuntary admission'* * * means:

(1) A person who is mentally ill and who because of his illness has recently engaged in an act or has recently made a significant threat which supports a reasonable expectation that he will inflict serious physical harm upon himself or another in the near future; or

(2) A person who is mentally ill and who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm and who has demonstrated that inability by engaging in behavior which poses a serious threat to his life or physical health."

■■ We first conclude that the uncontradicted expert medical evidence, which was supported by the lay testimony, clearly and convincingly established respondent was "mentally ill." (*In re Sciara* (1974), 21 Ill. App. 3d 889, 897, 316 N.E.2d 153.) Respondent's assertion that she merely had powers of extra-sensory perception, given evidence to the contrary, is unconvincing.

In *People v. Sansone* (1974), 18 Ill. App. 3d 315, 326, 309 N.E.2d 733, this court held that the State must prove the person is in need of mental treatment by means of a medical opinion which is clear and convincing and which is based upon facts which are established by clear and convincing evidence. Thus, we held both (1) that the facts upon which the medical opinion was based must be established by clear and convincing evidence, and (2) that the medical opinion, itself, must be clear and convincing. In *People v. Sansone*, the psychiatric witness explained how he reached his conclusion; he said respondent's delusions regarding law-enforcement officers reasonably led him to conclude that respondent would be dangerous to others because he had known persons with the same type of delusions who had injured or attempted to injure others, although respondent had not yet done so. We concluded that, although the psychiatrist could not give any degree or probability of dangerousness and although there was no evidence of any prior dangerous conduct, the uncontradicted expert testi-

mony established by clear and convincing evidence that the patient was in need of mental treatment.

In this case, we find Dr. Wright's testimony, when considered along with the evidence of previous dangerous conduct, was sufficiently clear and convincing evidence that respondent was reasonably expected to inflict serious physical harm upon another in the near future. (Ill. Rev. Stat. 1979, ch. 91½, par. 1—119(1).) Respondent's actions including scratching her mother on the hand during an altercation and holding a pair of scissors a few feet from her mother on the occasion which led to her emergency hospitalization are supportive of this conclusion. The latter conduct was a serious threat which (apart from the issue of criminal intent), could constitute an aggravated assault. See Ill. Rev. Stat. 1979, ch. 38, par. 12—2(a)(1).

Obviously, her mother felt threatened, since she immediately called police. Respondent, in cross-examining her mother through her attorney, attempted to show that although respondent at this time had the opportunity to harm her mother, she did not do so, and she repeats this argument here. However, the prior statute as interpreted by this court did not require the infliction of actual harm before commitment was authorized. (*In re Chapman* (1978), 67 Ill. App. 3d 382, 385 N.E.2d 56; *In re Graham* (1976), 40 Ill. App. 3d 452, 352 N.E.2d 387.) Other evidence, including respondent's admissions and her own testimony, established respondent's continuing hostility, particularly toward her mother. Respondent in fact threatened to kill her mother following her hospitalization on an emergency basis, and it is apparent that respondent's hostility toward her mother increased following her hospitalization. Respondent in her testimony blamed her present difficulties on her mother. Respondent had the opportunity, when she testified, to explain the incident with the scissors, but she failed to do so.

■■■ We recognize that due process forbids the involuntary confinement of persons who are dangerous to no one and can live safely in freedom. (*O'Connor v. Donaldson* (1975), 422 U.S. 563, 575, 45 L. Ed. 2d 396, 406-07, 95 S. Ct. 2486, 2493-94.) However, under these circumstances, we consider that the trial judge, who saw the witnesses and heard the evidence adduced, properly concluded that the respondent's action in threatening her mother was to be taken seriously. This, combined with respondent's other statements evidencing her continued hostility toward her mother, her generally hostile attitude, and the uncontradicted conclusion of the doctors that she was suffering from a mental illness, proved clearly and convincingly that she was reasonably expected because of her illness to inflict serious physical harm upon her mother in the near future if not hospitalized for treatment.

■■ Respondent would have us focus narrowly on Dr. Wright's use of the term "possibly" in evaluating his testimony, to show it was of an equivocal

nature. A similar opinion was found not to be a clear and convincing medical opinion of the type required in *Sansone*. (*People v. Bradley* (1974), 22 Ill. App. 3d 1076, 318 N.E.2d 267.) In *Bradley*, the expert witness phrased his opinion in terms of "conceivably" rather than "possibly." However, this requirement has been somewhat relaxed in subsequent cases especially when there is clear evidence of prior dangerous conduct or strong lay evidence. (*In re Graham*; *In re Chapman*; *In re Haber* (1979), 78 Ill. App. 3d 1120, 398 N.E.2d 121; *cf.*, the testimony in *In re Stephenson* (1977), 67 Ill. 2d 544, 562-63.) This court has upheld commitment orders under resembling circumstances in which there was no explicit medical opinion regarding the patient's future dangerous conduct, but where there was evidence of actual prior dangerous conduct and other evidence such as lay opinion. After considering the doctor's entire testimony together with the other evidence presented, we conclude that there was sufficient evidence in the present case to show respondent's dangerous propensities.

Respondent points out that Dr. Wright did not, as required by section 3—208 of the Mental Health and Developmental Disabilities Code, inform her that she did not have to talk to him. The statute (Ill. Rev. Stat. 1979, ch. 91½, par. 3—208) provides:

"Examinations for certification—Statement of rights

Whenever a petition has been executed pursuant to Section 3—507, 3—601 or 3—701, and prior to this examination for the purpose of certification of a person 12 or over, the person conducting this examination shall inform the person being examined in a simple comprehensible manner of the purpose of the examination; that he does not have to talk to the examiner; and that any statements he makes may be disclosed at a court hearing on the issue of whether he is subject to involuntary admission. If the person being examined has not been so informed, the examiner shall not be permitted to testify at any subsequent court hearing concerning the respondent's admission."

The commission which drafted this section said its purpose was to extend the privilege against self-incrimination to persons 12 years of age or over undergoing certification examinations; the commission explained that the right "not to have to talk to" the examiner was an expansion of Illinois case law. (Governor's Commission for Revision of the Mental Health Code of Illinois, Report, Part One, at 38-39 (1976).) This court has recently held that the testimony of an examining psychiatrist must be stricken on motion when it is shown that he had not given the warnings required by section 3—208. *In re Rizer* (1980), 87 Ill. App. 3d 795, 409 N.E.2d 383.

The State points out that in this case, no objection was made to the doctor's testimony and no motion was made to strike the doctor's testimony

in the trial court. Therefore, it argues that respondent's objection is waived. But respondent argues that the rationale behind this statute is similar to that behind *Miranda v. Arizona* (1966), 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and that this court should invoke the plain error doctrine of Supreme Court Rule 615 (Ill. Rev. Stat. 1979, ch. 110A, par. 615(a)).

In examining the record, we note that, after counsel elicited from Dr. Altman that his examination was for the purpose of certification, counsel asked if he had advised respondent that she did not have to speak to him. Yet counsel did not put similar questions to Dr. Wright, and examined Dr. Wright concerning the substance of his examination of respondent.

The State also argues that section 3—208 does not apply because Dr. Wright's examination was not "for the purpose of certification." Two certificates were filed, one by Dr. Altman and the other by a doctor whose signature is illegible. Thus, since Dr. Wright was not asked to clarify this matter, the record also does not establish that Dr. Wright's examination was for certification.

■■ Under the circumstances, we would have to speculate concerning whether Dr. Wright filled out the certification and if he properly advised respondent. This matter could easily have been determined in the trial court by questioning Dr. Wright at trial, by having respondent testify concerning this matter, or even by way of a post-trial motion. After reviewing the record, we consider this issue is not properly preserved for review. One may not sit idly by and allow possibly irregular proceedings to occur without objection and then afterwards seek reversal by reason of those same irregularities. *People v. Marigny* (1972), 51 Ill. 2d 445, 451-52, 356 N.E.2d 423.

The judgment of the circuit court of Cook County is therefore affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.