*In re* JOANNA MAZZARA (The People of the State of Illinois, Petitioner-Appellee, v. Joanna Mazzara, Respondent-Appellant).

Fourth District   No. 4—84—0678

Opinion filed May 6, 1985.

WEBBER, J., dissenting.

Roger Derstine, of Guardianship & Advocacy Commission, of Chicago, and Kathryn E. Eisenhart, of Guardianship & Advocacy Commission, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman, of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

Following a hearing in the circuit court of Sangamon County, respondent was involuntarily admitted to a mental health facility pursuant to sections 3—700 through 3—819 of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1983, ch. 91½, pars. 3—700 through 3—819). The court found that respondent was a person subject to involuntary admission because she was mentally ill and, because of her illness, she was reasonably expected to inflict serious physical harm upon herself or another in the near future. (Ill. Rev. Stat. 1983, ch. 91½, par. 1—119(1).) The court ordered that respondent be hospitalized at St. John's Hospital in Springfield. Respondent now appeals, contending that the State failed to prove that she was a person subject to involuntary admission.

Two petitions for involuntary admission were filed on September 10, 1984, alleging that respondent was mentally ill and that, because of her illness, she was reasonably expected to inflict serious harm upon herself or another in the near future. The petitions were accompanied by the necessary physician's certificates stating that respondent was a person subject to involuntary admission. See Ill. Rev. Stat. 1983, ch. 91½, par. 3—702.

A hearing on the petitions was held on September 14, 1984. Respondent's mother testified that respondent had lived with her from 1980 until August 1, 1984. She stated that respondent had recently passed an examination which qualified her as a certified public accountant (C.P.A.). In August respondent moved to her own apartment. Her mother testified that she visited respondent on September 9, 1984, and found her to be "not as well kept." At that time respondent was "running up and down the stairs." Later an ambulance and police arrived, and respondent was taken to St. John's Hospital.

Dr. Philip Bornstein, a psychiatrist, testified that he examined the respondent on September 10, 1984, and found her to be restless, irritable, and hostile at the beginning of the interview. She later "settled

down," although Dr. Bornstein perceived her as "rather threatening." Respondent insisted that there was nothing wrong with her, that she did not need to be in the hospital, and that she was going to call a lawyer. She remained uncooperative in subsequent interviews.

Dr. Bornstein then examined certain letters which respondent had recently mailed to Mr. and Mrs. Loren Payne. He characterized one such letter, marked as exhibit No. 5b, as essentially incomprehensible and typical of manic thinking. He described another letter, exhibit No. 9, as a compilation of disorganized thoughts suggestive of delusional thinking. He then stated:

"I think Joanna could be dangerous to others, possibly to herself if she's depressed, but she isn't right now but to others simply because she's so disorganized in her thinking and apparently has a number of delusions behind her thinking which she is not able at the present time at least to share with me which are alluded to in her letters. There is a consistent thread throughout the letters, her relationship to movie stars, the F.B.I., things of this nature which she obviously feels very strongly about.

\* \* \*

The number of illusions [*sic*] to last chance which I wonder if were threats or not, but most of this represents what I'm fairly certain are delusional thinking of some kind which I can't delineate further since she hasn't been willing to talk with me about this. I think if she has these delusions about people who are real and I noticed that all these letters are addressed to the same persons, namely, the Paynes, whoever they may be, I'll be concerned that perhaps she has some delusions about them which would lead to their harm."

Respondent then testified that she had become a certified public accountant on July 31, 1984. She stated that she had become acquainted with Loren Payne through telephone conversations in the course of a business relationship that had ended three years ago. She began sending Payne and his wife letters in August 1984 because she "was worried about his welfare." She apparently feared that he had become involved in an alleged embezzlement scheme with her sister.

Respondent knew the license plate numbers of the Paynes' cars. She stated that she had seen Mrs. Payne driving between Rochester and Springfield, Illinois. However, she denied that she had followed Mrs. Payne through Springfield as alleged by Mrs. Payne in the petition for involuntary admission. Respondent hoped that she would not see Mrs. Payne's car again.

The circuit court found that the evidence established that respondent was suffering from a mental illness. Based upon Dr. Bornstein's observations and opinion, the court found that, by reason of her illness, respondent was reasonably expected to inflict serious physical harm upon herself or another in the near future. The court then ordered that she be hospitalized. Respondent filed timely notice of appeal.

Section 1—119(1) of the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1983, ch. 91½, par. 1—119(1)) provides that a person is subject to involuntary admission if he is mentally ill and, because of his illness, is reasonably expected to inflict serious physical harm upon himself or another in the near future. Respondent does not dispute the court's finding of mental illness here. However, she does argue that it was not sufficiently established that she was reasonably expected to inflict serious physical harm upon herself or another in the near future. We disagree.

In a proceeding for involuntary commitment under the Act, the State is required to prove the necessary allegations of the petition by evidence, when it is all considered, that is clear and convincing. (*In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273.) However, the reviewing court must give deference to the trial court's decision and cannot set that decision aside because it, applying the above standard, would have ruled differently. *In re Johnston* (1983), 118 Ill. App. 3d 214, 454 N.E.2d 840.

Here, the only evidence introduced by the State which tended to prove that respondent could reasonably be expected to harm herself or another in the near future was the testimony of Dr. Bornstein and the letters written by the respondent to the Paynes. Dr. Bornstein testified that respondent could be a danger to herself if she were depressed. However, she was not depressed at the time. He also stated that respondent "could" be dangerous to others because of her disorganized and delusional thinking. He was concerned that "perhaps" she had some delusions about the Paynes which would lead to their harm. However, because respondent refused to talk to him, Dr. Bornstein was not sure what her delusions were actually about.

In the case of *In re Gregorovich* (1980), 89 Ill. App. 3d 528, 411 N.E.2d 981, evidence of bizarre conduct on the part of respondent, which included the making of threats and assaults in response to her mother's demands and the testimony of a psychiatric resident that there "is a possibility [the respondent] could harm someone," was held to be sufficient to support, on appeal, a trial court's finding that a mentally ill person was subject to involuntary commitment on the

basis of the danger that she could harm someone. (89 Ill. App. 3d 528, 532, 411 N.E.2d 981, 984.) Here, the expert's prognosis had the same degree of certainty as that in *Gregorovich.* The uncertainty arose partly because the respondent would be likely to be dangerous only when she was in a depressive phase of her illness. That could happen at any time without substantial warning. Courts recognize that medical experts have difficulty in predicting with certainty the likelihood that a mentally ill person will harm someone. The State is not required to wait until the danger is acute that harm may be imposed on another. *In re Johnston* (1983), 118 Ill. App. 3d 214, 454 N.E.2d 840.

The respondent relies on the case of *In re Dieter* (1977), 55 Ill. App. 3d 7, 370 N.E.2d 84, where the evidence was held to be insufficient to support a determination that the respondent there would be reasonably expected to harm herself or others. The respondent was shown to have scratch marks on her wrist, but in testimony the appellate court described as being undisputed, the respondent claimed that she received those wounds as a result of scratches by her cat. A psychiatrist had testified that she was more likely than not to harm herself or another but was unable to give reasons for his opinion. Here, there was an undisputed record of prior conduct by the respondent of delusional thinking and her letters to the Paynes. The psychiatrist who testified in regard to respondent's condition took those matters into consideration in forming his opinion. Thus, the proof here was considerably stronger than in *Dieter.*

We affirm the order of commitment.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE WEBBER dissenting:
I respectfully dissent.

In medieval London there existed in the Lambeth area the priory of St. Mary of Bethlehem. In the dialect of the day, "Bethlehem" would become "bedlam." In 1402 the priory was turned into a hospital for lunatics and its name was soon shortened to "Bedlam." From that the term has come to mean tumultuous uproar and confusion characteristic of early asylums.

I submit that the principal opinion returns mental health proceedings to the days of Bedlam, when incarceration and restraint were the only approved methods of dealing with mental cases.

Until approximately 20 years ago, incarceration and restraint

were State policy in Illinois. The large institutions at Jacksonville and Manteno and elsewhere about the State now stand largely vacant, but a generation ago they were crowded. In the middle 1960's psychiatric theory emphasized community-based outpatient treatment, and in pursuance of that theory, which became the policy of the State, the various mental health centers were built (*e.g.*, Meyer in Decatur, Adler in Champaign, McFarland in Springfield). So far as I am able to determine, that still remains the policy of the State. To put it another way, restraint must be the last option.

In Shlensky, *Constitutional Problems with Mental Commitment in Illinois*, 62 Ill. B.J. 552, 558-59 (1974), the author states:

> "The psychiatric profession *is* cognizant of the rights of mentally ill patients. In the March, 1973 issue of the *American Journal of Psychiatry* (130:3), the American Psychiatric Association published a position statement on involuntary hospitalization of the mentally ill which was revised from previous positions. Basically the Association took the position that most persons who need hospitalization for mental illness can and should be informally and voluntarily admitted to hospitals in the same manner that hospitalization is afforded for any other illness. The Association also took cognizance of the fact that modern concepts of psychiatric treatment emphasized the use of community-based outpatient facilities for the treatment and care of the mentally ill who voluntarily seek these services. Psychiatrists nowadays attempt to avoid hospitalization to every possible extent, although for some patients a period of hospitalization, usually brief, continues to be the indicated treatment. On the other hand, the Association recognized that a small percentage of patients who need hospitalization are unable, because of their mental illness, to make a free and informed decision to hospitalize themselves. Their need for and the right for treatment in a hospital should not be ignored. Public policy demands that some form of involuntary hospitalization be available for those mentally ill patients who constitute a danger either to themselves or to others."

I submit that this respondent is not one of that small number of persons referred to by Dr. Shlensky who are unable to make the decision to commit themselves. The majority pays lip service to the burden of proof, clear and convincing evidence, but places its imprimatur on restraint when the only evidence is that of delusional thoughts and not a scintilla of evidence of real or potential harm to the respondent or others.

To test the thesis, let us assume that the respondent here was a defendant in a criminal proceeding and raised the affirmative defense of insanity under section 3—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 3—2). Would anyone seriously argue that she had sustained her burden of proof with the evidence in this record? I think not.

While it may be bootless to argue the evidence and procedures below, since each of these cases must stand on its own, yet I feel a couple of comments are in order. First of all, two petitions were filed, one signed by Mrs. Payne and the other by an emergency room nurse at St. John's Hospital; yet neither of these petitioners was called to testify. Presumably they are eyewitnesses. One can only speculate as to why the State either neglected to call, or deliberately avoided calling, them.

Much is made in the record and in the briefs over the letters sent by respondent to Mr. and Mrs. Payne. They are properly described in Mrs. Payne's petition for involuntary admission of respondent as "rambling and incoherent." Yet there is no suggestion of threats or intimidation in any of them. If Molly Bloom's soliloquy in James Joyce's *Ulysses*, which is rambling and incoherent, is considered great literature, on what basis can a private series of letters of a similar nature be considered *per se* a menace?

This respondent has been condemned on the basis of delusional and hallucinatory thinking, which Dr. Bornstein said "perhaps" or "could" make her dangerous to herself or others. If all the persons in Illinois who have at one time or another engaged in delusions, or even hallucinations, were to be locked up, as was this respondent, we will be required to reopen all of the State hospitals and enlarge them by many times.

"Bedlam" is not the criterion. The criterion is clear and convincing evidence, not a series of subjunctive phrases from an expert witness.

I would reverse the trial court.